IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JAMES R. W,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 17-cv-1156-CJP[2] |
| | ) |
| COMMISSIONER of SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff applied for disability benefits in November 2014, alleging disability as of January 1, 2013. After holding an evidentiary hearing, ALJ P. H. Jung denied the application on February 21, 2017. (Tr. 14-21). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed

---

[1] In keeping with the court's recently adopted practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 35.

in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ did not properly consider plaintiff's RFC in that he failed to properly evaluate his chronic obstructive pulmonary disease.

2. The ALJ ignored the vocational expert's testimony regarding additional breaks during the workday.

3. The ALJ erred in considering his daily activities.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience

significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Murphy v. Colvin,* 759 F.3d 811, 815 (7th Cir. 2014). However, while

judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

ALJ Jung followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date.

The ALJ found that plaintiff had severe impairments of chronic obstructive pulmonary disease (COPD), emphysema, and hyperlipidemia, which did not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the medium exertional level, including standing or walking for six hours a day, but limited to frequent climbing of ramps and stairs; occasional climbing of ladders, ropes, and scaffolding; and no more than frequent exposure to temperature extremes and environmental irritants.

Based on the testimony of a vocational expert, the ALJ concluded that plaintiff was not able to do his past work, but he was not disabled because he was able to do other jobs which exist in significant numbers in the national economy.

### **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record

is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born in 1959. He was 53 years old on the alleged onset date. (Tr. 168). He said he stopped working because of health problems in December 2011. He had worked at a number of different jobs, including tree trimming, laundry worker, laborer, and cashier. (Tr. 172-173).

Plaintiff submitted a function report in February 2015 stating that his daily activities were limited and sometimes impossible. He said he got "winded" with simple tasks. He had coughing spells where he could not get air. He was "wheezing most of the time." He did not do much because of fatigue and shortness of breath. He fed and watered the dog. He made simple meals such as sandwiches, soup or cereal. He used a riding mower. His fiancée did most of the shopping, but he did go with her if shopping for only a few items. He spent most of his time reading or watching tv. He visited his parents. (Tr. 179-187).

2. **Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing in November 2016. (Tr. 28).

Plaintiff was 5'11" and weighed 176 pounds. He was covered by Medicaid. (Tr. 31).

Plaintiff said he could not work because he could not breathe. He smoked cigarettes up until about eight months earlier. The ALJ asked him why he was

"panting." He said, "I just can't get no air." Plaintiff said his doctor told him he would probably be on oxygen within a year. He used a nebulizer four times a day, for fifteen minutes a time. (Tr. 31-32). He also used daily inhalers and a rescue inhaler. (Tr. 34).

Plaintiff's fiancée did most of the household chores. While she was at work, he fixed a simple lunch, maybe a sandwich or a microwaved meal. He was unable to even sweep off the deck. He got out of breath getting dressed. (Tr. 33-34). He had coughing spells every morning, during which he became dizzy and light headed. The most he could lift was a coffee cup. (Tr. 36-37). He would be winded after walking for five minutes. (Tr. 38).

A vocational expert also testified. In response to a hypothetical question which matched the RFC assessment, she testified that plaintiff could not do his past work, but he could do other jobs. If he were required to take unscheduled breaks totaling one hour out of the workday, he would not be employable. (Tr. 42-44).

### 3. Medical Records

Plaintiff's primary care physician was Dr. Alberto Butalid. He was often seen by Karen Hummel, a physician's assistant in the same office. He was seen for the first time in July 2014. He had not been to a doctor for years. As is relevant here, he complained of shortness of breath, which he attributed to smoking. (Tr. 355-357.

In July 2014, a chest x-ray showed mild scattered interstitial fibrosis with no focal consolidation, overt failure or pleural fluid. There was no acute

cardiopulmonary disease. (Tr. 269).

In August 2014, a pulmonary function test resulted in an FEV1 score of 70% of the predicted value, not reversible with bronchodilator therapy. The report says the findings were suggestive of moderate degree of COPD with moderate to severe degree of small bronchial spasm. (Tr. 285).

PA Hummel saw plaintiff in early August 2014 because he wanted her to complete paperwork for use in getting his license reinstated after a DUI. She noted that a recent pulmonary function test showed moderate COPD and he was "doing well on the inhalers that were prescribed." (Tr. 361).

PA Hummel saw him later in August 2014 to follow up for COPD. He had a chronic cough with dyspnea, i.e., shortness of breath. His symptoms were worse on exertion. He said he could walk 40 feet before resting. On exam, there was no cyanosis. His lungs were clear to auscultation with no wheezes or crackles. He was to continue using inhalers as prescribed, and PA Hummel discussed the importance of quitting smoking with his diagnosis. (Tr. 363-365).

In October 2014, plaintiff told Dr. Butalid that he had shortness of breath "more so with exertion to the mail box about 70 feet." He had normal breath sounds and voice sounds on exam. The assessment was chronic COPD. (Tr. 496-497).

When Dr. Butalid saw plaintiff in January 2015, he detected abnormal breath sounds and slightly decreased voice sounds. (Tr. 493-495).

Dr. Adrian Feinerman performed a consultative examination of plaintiff in

March 2015. He reviewed the pulmonary function study from August 2014. Plaintiff complained of shortness of breath which got worse with activity and better with rest. On exam, he was 5'11" tall and weighed 182 pounds. He had a few expiratory wheezes. He was able to ambulate for 50 feet. Dr. Feinerman ordered a pulmonary function study. This showed an FEV1 level of 65% of the predicted range with no change after bronchodilator. He diagnosed COPD. (Tr. 288-299).

In March 2015, plaintiff was seen by Dr. David Wallace on Dr. Butalid's referral because he had an episode of syncope. A chest x-ray showed moderate hyperinflation with no acute changes. Dr. Wallace also recommendation quitting smoking. (Tr. 341-345).

In May 2015, Dr. Wallace noted that plaintiff had stopped smoking. He said he would defer to Dr. Butalid on plaintiff's COPD issues. (Tr. 329).

Dr. Butalid saw plaintiff for a 3 month follow up on his COPD in May 2015. He had quit smoking and was doing fair. He was to continue on his current medication and inhalers. (Tr. 313-315).

Plaintiff began seeing Dr. Douglas Dothager, a pulmonologist, in September 2015. He had cut down his smoking to about half a pack a day. He was having increasing shortness of breath and wheezing and coughing. He had an episode of cough with syncope. A cardiac work-up had been negative. He was using albuterol in a nebulizer 4 times a day as well as Symbicort and Spiriva. On exam, oxygen saturation level was 92% on room air at rest. His lungs were clear to auscultation. Dr. Dothager diagnosed COPD and ordered testing. (Tr. 564-565).

A chest x-ray done in October 2015 showed clear lungs with no effusion or pneumothorax. There was bilateral apical scarring. A pulmonary function test resulted in an FEV1 score of 1.97, which was 52% of the predicted value, with no change after administration of a bronchodilator. (Tr. 568-569).

Dr. Dothager noted the above test results and concluded that the pulmonary function testing was consistent with a moderate obstructive ventilator defect. He recommended that plaintiff use his nebulizer 4 times a day and enroll in a pulmonary rehabilitation program. Plaintiff had stopped smoking for about a week. (Tr. 561).

In February 2016, Dr. Dothager diagnosed plaintiff with stage II COPD. Plaintiff was not smoking cigarettes, but was using vapes. He felt like he had an upper respiratory tract infection. On exam, oxygen saturation was 98% on room air. His lungs had "a few end expiratory wheezes." He was unable to afford the pulmonary rehabilitation program. (Tr. 559).

In July 2016, Dr. Butalid said that plaintiff was doing fair. He had a mild baseline shortness of breath. His lungs had normal breath and voice sounds. (Tr. 538-539).

The last visit with Dr. Dothager was in August 2016. He again felt like he had an upper respiratory tract infection. There was no wheezing on exam. He was to continue using the nebulizer 4 times a day as well as Spiriva once a day and Symbicort twice a day. He also prescribed a Z-Pak because of the exacerbation/bronchitis. (Tr. 557).

## Analysis

Plaintiff first argues that the ALJ failed to adequately consider the evidence regarding his lung disease. Specifically, he argues that the ALJ placed too much emphasis on chest x-rays, and not enough emphasis on the pulmonary function studies.

Regarding the x-rays, plaintiff argues that the ALJ's reliance was improper because lung x-rays do not measure lung functioning. Plaintiff cites to materials he obtained from two websites for that proposition. However, that is an appeal to the Court to weight the medical evidence, a task that is beyond the Court's proper function and one which the Court is not qualified to perform. Further, the chest x-rays were ordered by doctors who were treating plaintiff for breathing complaints and constitute relevant medical evidence.

Plaintiff also argues, somewhat inconsistently, that the ALJ also erred in failing to acknowledge that the March 2015 x-ray showed moderate hyperaeration indicative of COPD. This argument seems to tacitly concede that the x-rays have some relevance. It is true that the ALJ called the March 2015 x-ray "negative" and failed to note that it showed hyperaeration, but that fact alone is of little significance. Again, this Court cannot determine the significance of the finding of hyperaeration on a lung x-ray. The ALJ accepted that plaintiff has COPD, and the March 2015 x-ray, under plaintiff's own analysis, is of little help in determining the severity of his breathing problems. Plaintiff also argues that the ALJ ignored the finding of apical scarring on the October 2015 x-ray. He is incorrect. The ALJ

noted that the x-ray showed apical scarring at Tr. 18.

Plaintiff's point about the pulmonary function studies is on firmer ground. The Listing for respiratory system impairments, 3.0, describes pulmonary function studies. The type of pulmonary function studies that were administered to plaintiff is called spirometry. Spirometry measures how well the patient moves air into and out of his lungs. It involves "forced expiratory maneuvers." A forced expiratory maneuver is a maximum inhalation followed by a forced maximum exhalation. FEV1 is the volume of air the patient exhales in the first second of the forced expiratory maneuver. If the FEV1 value is less than 70% of the predicted normal value, spirometry should be repeated after administration of a bronchodilator. See, 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 3.00, Respiratory Disorders, paragraph 3.00E.

The AJ noted the results of the three pulmonary function studies, but offered no analysis of their significance. He merely stated that the March and October 2015 results did not meet listing level. See, Tr. 18.

Plaintiff points out that the October 2015 results were "near" listing level. However, the significance of the raw numbers is impossible to judge without knowing the bottom and the top of the range. And, again, it is not the Court's function to weigh the medical evidence.

All that having been said, plaintiff is correct that the ALJ failed to properly consider the results of the pulmonary function studies in that he failed to analyze the significance of the test results in context.

The report of the March 2015 test said that FEV1 was 65% of predicted normal value. According to the state agency consultants who reviewed the record, the FEV1 measurement on the March 2015 test was either 2.52 or 2.62. (Tr. 52, 64). The report of the October 2015 test indicated that FEV1 was 1.97, which was 65% of predicted normal value. Both tests reflected no improvement with bronchodilator therapy.

These results suggest that plaintiff's lung function was decreasing over time, a point that was ignored by the ALJ. Defendant points out in her brief that the ALJ did, in fact, note the results of the studies. However, simply noting that the results were not at listing level without considering the significance of the results in context was not sufficient. The ALJ was required to weigh the medical evidence. He erred by failing to "engage sufficiently" with the medical evidence. *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016).

Further, the ALJ gave "great weight" to the opinions of the state agency reviewers in formulating the RFC assessment (Tr. 19), but those doctors formed their opinions in March and August 2015. See. Tr. 52, 64. The state agency consultants did not have the opportunity to consider the October 2015 pulmonary function study. Their opinions therefore do not provide substantial support for the ALJ's RFC assessment. *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), as amended on reh'g (Apr. 13, 2018).

The ALJ concluded that plaintiff was able to do medium work. Medium work requires "lifting no more than 50 pounds at a time with frequent lifting or

carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). Frequent is defined as "occurring from one-third to two-thirds of the time." SSR 83-10, 1983 WL 31251, *5-6. "In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time." SSR 83-10, at *6.

The determination of whether plaintiff was capable of sustaining medium exertion work in light of his breathing problems is crucial here. Plaintiff was in the "advanced age" category at the time of the ALJ's decision. (Tr. 20). If he were limited to light work with no transferrable skills, he would be deemed disabled at that age under the Medical-Vocational Guidelines ("Grids") 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 2.

The ALJ erred in failing to consider the results of the pulmonary function studies in context and in relying on the opinions of state agency consultants who had not seen the latest study. In view of these errors, it is not necessary to analyze in depth plaintiff's other points. As to his second point, there was no evidence that plaintiff would be required to use his nebulizer during the workday. As to his third point, the daily activities cited by the ALJ were not physically demanding and provide little support for his conclusion that plaintiff was exaggerating his symptoms.

The Court must conclude that ALJ Jung failed to build the requisite logical bridge between the evidence and his conclusion. Remand is required where, as

here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review."  *Kastner v. Astrue*, 697 F.3d at 646, citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that he should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is REVERSED and REMANDED to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   August 17, 2018.**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**